Good morning. May it please the court, my name is Maria Ozolins. My partner, Mackenzie Houck, and I are certified law students participating in the Boston College Law School Ninth Circuit Appellate Project. We are appearing under the supervision of Professor Kari Hong, who is seated at the council table. We represent petitioner Rita Maria Carrion Garcia, whom we will refer to as Miss Carrion. With leave of the court, I respectfully wish to reserve two minutes for my partner to provide a rebuttal. The BIA made four reversible errors in denying Miss Carrion relief. In the first reversible error, Taha holds that the BIA cannot deny a Convention Against Torture claim based only on an adverse credibility finding. That, however, is exactly what the BIA did. Because CAT is a mandatory remedy, a CAT claim may be granted even if there is an adverse credibility finding. And on this record, substantial evidence compels reversing the BIA decision. Do you agree that the adverse credibility finding holds? That we were going to have to decide that adverse credibility applies to all of the claims? We would argue that the adverse credibility finding is not supported by substantial evidence, but even if you disagree. Wait a minute. She lied to people. She committed perjury under oath in a district court. That's not substantial evidence? We argue that an error that the BIA made is penalizing Miss Carrion for not immediately disclosing to the Border Patrol and district court that she was fleeing from rapes, beatings, and death threats. And it is undisputed that she gave a false name, birth date, and nationality. Well, she had a reason, but the question is, she didn't have to lie.  Your Honor, she's just Your Honor, she committed perjury. She didn't have to commit perjury, but she did. So that she has a good reason for wanting to be here, does that do we just throw away the adverse credibility finding, which seems pretty solid? We argue that the BIA ignored Miss Carrion's explanation that she lied because she was afraid to go back to the Dominican Republic, that her coyote had warned her if she had told the truth, she would be immediately returned to the Dominican Republic, where she would face her rapist. And under Shrestha, not every factor will support an adverse credibility finding. Rather, under the Real ID Act requires that fact finders consider and evaluate the context in which any false statement is made, that any credibility finding must be reasonable and must take into consideration the individual circumstances of the applicant. See, this is a little bit of a different case. I understand your argument, which is basic immigration law, that you don't base the C.A.T. decision solely on a credibility finding, but what do you have here otherwise? I mean, that's really the difficulty here, is it seems that the record is the IJ didn't have anything else to even base a C.A.T. finding on. We would argue that there is substantial evidence that compels reversing the BIA decision on the C.A.T. claim as well. What? On the torture issue, under C.A.T., we have a police report, two witness affidavits, Ms. Kerian's reasonable fear interview, and her application for withholding of removal, which compel holding that she had been raped, beaten, and threatened with death. No, but she has adverse credibility finding, so we don't have all of that. I mean, her credibility underlies all of those things, doesn't it? No, Your Honor. The police report is submitted by her mother. The two witness affidavits are based on what she told her mother. Your Honor, the police no, Your Honor. The police report was based on the mother's continued harassment by Ms. Kerian's abuser, who continually visited her home and threatened her daughter with death if she ever returned to the Dominican Republic. And that was ongoing for months after Ms. Kerian fled the Dominican Republic. Counsel, I understood that the mother said that the former boyfriend or whatever had talked to her and was still looking for her and threatened her, but that the mother's affidavit or declaration does not say she has first-hand knowledge of there being domestic violence against the daughter. Am I right in that? In other words, the mother doesn't say, I witnessed this guy beat her, or I saw her bruises? Yes, Your Honor, you're correct. There's no first-hand witness. Okay, so then here's my question. It's really similar to Judge McEwan's. I realize there has to be an independent review of whether the evidence and the record supports a cat claim apart from her credibility. But the agency, although making its statement succinct, did say, they said, on cat, there's no evidence in the record that she was ever tortured. There's a likelihood of torture. So you come down to what's the evidence on that. And like Judge McEwan, I'm not seeing much apart from her own statements which were deemed not credible. So you've got two affidavits. One is the mother, but as you've said, that's limited in its scope. The other is some guy from the Bronx who also didn't have first-hand knowledge. And you've got a police report. I thought that was a report filed by the mother, is that right?  It's not a report filed by the mother, it speaks of the former boyfriend showing up at her house, asking for my daughter, saying that he was going to kill her. And, Your Honor, the sworn affidavit from Ms. Caron's mother says that the relationship was tinged by physical abuse, threats, rapes, insults, and that the domestic partner threatened to kill her. And the sworn affidavit from someone who the record does not show, but we later found through conversations with our client, to be the same. Is that in the record what you're talking about now? Yes. The sworn affidavit from a third person that knew Ms. Caron in the Dominican Republic said that the Bronx fellow, yes, that her life has been in danger due to the fact that she was in a domestic violence situation. And we've found out that the mother's statement that her wife's tinged with abuse or the statement of the guy in the Bronx that her life's in danger, do those statements compel the conclusion that she was raped in the Dominican Republic? Yes, Your Honor. Isn't that the statement for us? Do they compel that? And so is there, for example, is there any medical evidence in the record, like hospital visits or doctor visits after a physical encounter that would show definitively that she had suffered at the hands of this guy? No, Your Honor. There is no medical record, but these sworn affidavits directly corroborate Ms. Caron's claim that she had suffered torture in the Dominican Republic. And these beatings, rapes, and death threats do constitute torture under Garcia Millan. But the board said that there's nothing that shows she faces a clear probability of torture, and then here's the key language from the statute and the treaty, at the instigation of or with the consent or acquiescence of current government officials. What's the evidence of that? On the acquiescence issue, Garcia Millan holds that a police force's inability to solve a crime and government's mere lack of resources are not enough to show acquiescence. Rather, there has to be, first, public officials must have an awareness or consciously close their eyes to the torture, and second, breach their legal responsibility to intervene. And this record does meet that standard. How? The expert opinion prepared by Dr. Westhoff and country condition reports establish that the Dominican Republic deliberately forced the closure of the only operating domestic violence shelter, even though between one-half and one-million Dominican women like Ms. Caron are victims of domestic violence annually. Local police often refuse to even take declarations from victims, and when complaints are made, judges and prosecutors have the authority to track these cases into non-criminal proceedings. Do we have anything that relates to why she would have a clear probability of torture, other than that expert, broad declaration? I mean, it's not what we usually see in these cases is I went to the police, I went to the police, they wouldn't do anything, they wouldn't investigate. The police told me they couldn't, they don't have enough money. We don't have any of that here, do we? Ms. Caron testified that she was afraid to go to the police because she feared further beatings from her abuser, and under or not. Well, that's understandable, but does that mean that the police won't help? Yes. In Dr. Westhoff's work, the expert witnessed the local police refuse to help him by arresting even a single perpetrator, and when he was operating the country's only shelter, he helped U.S. citizens who were victims of domestic violence. So based on your theory, I guess that every single woman, and I'm totally sympathetic to their plight, but every single woman who's ever been raped in the Dominican Republic would be eligible for cat relief in the United States, is that correct? We argue that a woman like Ms. Caron, who suffered beatings, rapes, and death threats, and cannot go to the police for protection because the government acquiesces in her torture. So the answer is yes, basically, they would all be eligible for cat relief. We argue that Ms. Caron is eligible for cat relief. Thank you. Your Honor. Why don't we reserve the remaining 14 seconds for your colleague, but we'll actually restore the time. Thank you, Your Honor. Good morning, Your Honors. Tiffany Walters for Respondent of the United States Attorney General. The record does not compel the conclusion that Ms. Caron is credible. The immigration judge here properly relied on her pattern of providing false statements under oath to Federal immigration officials and to a district court judge in criminal proceedings. Ms. Caron was interviewed on four separate occasions by Spanish-speaking immigration officials. Each of these interviews began with advisals informing her of her rights and the purpose of the interview. At the beginning of each of these interviews, she was specifically informed of the availability of protection in the United States. She was read a section that informed her that U.S. law provides protection to certain persons who face persecution, harm, or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. Where was that found? That's in each of the sworn statements. That's part of the advisals that each immigration officer reads to the alien before going through the interview with the alien and expedited. This is not a piece of paper. This is something someone reads to them? It's read to her. It's memorialized in a piece of paper in the record for each of the four interviews. So do we know what it was in this case? It was this interview was conducted and read to her. But there's a memorialized record of it. And then at the end of the interview, the officer goes over the entire interview, reads it through in Spanish. Are you telling me what usually happened or what we have testimony that happened in this case? We have signed statements in this case that this happened in each of the four. Was it in English or Spanish? In Spanish. These were all Spanish-speaking officers. Okay. And in her testimony, Ms. Carreon indicated that she understood these officers. There were not communication difficulties. Counsel, could I ask you a question, please? Apart from the negative credibility determination, which, of course, doesn't totally control under CAP, under COMALFIS, even if we sustain that determination, I guess I would like to know whether the evidence that's in the record compels the conclusion that Ms. Garcia, in fact, was raped and was subjected to domestic violence while in the Dominican Republic. Well, even under the CAT claim, the fact that her testimony was not found credible affects the validity of that evidence. So we can't look to her testimony to establish that she was the victim of domestic violence. In addition to that. So how about the evidence apart from her testimony? Apart from her testimony, we have an affidavit from Pebbles Garcia, which is an individual living in the Bronx who makes some statement as to the domestic violence, but it's not clear how that person had information regarding domestic violence, whether she actually witnessed it, what the extent of that knowledge is. And then we have the statement from her mother and then the police report. And the statement from her mother also reflects things that she was told by Ms. Carreon, and also it is dependent on Ms. Carreon's testimony to authenticate it. And her mother was not present to be cross-examined, so there was no way for the immigration judge to determine the credibility of her mother's statement. The police report, effectively, is just a report that Ms. Carreon's mother made, and it contains her mother's statements. It's not an independent document reflecting the police investigation of any specific incident. It simply reflects Ms. Carreon's mother's claims as to what happened to her and what she was told by her daughter. Well, this is almost like a tautology, the way this Camalthus case works. It says you can't predicate Katz solely on adverse credibility, correct? Sure. Okay. So then we read the board's opinion, and they say basically because the evidence of threat depended on her credibility, the adverse credibility determination necessarily precludes success on Katz. Isn't that statement, at least so far as read, in direct contravention of Camalthus, which says you can't predicate it solely on an adverse credibility finding? Well, not in this case, because there's nothing more than the adverse credibility finding to establish the claim. I mean, here we have to accept that she was a victim of domestic violence before we get to the country condition evidence, before any of that is relevant. So if we can't establish that she credibly has this claim, that she was subjected to domestic violence, none of the other evidence comes into play to establish that she's a victim of torture. So you would say that you then necessarily basically don't even consider the expert affidavit about, or the country conditions in Dominican Republic about police impunity with respect to domestic violence victims? I think that's clear, because we don't know if she was a domestic violence victim. So it's not entirely clear how she could establish that she would be tortured in Dominican Republic as a domestic violence victim if she hasn't made that first evidentiary determination that she was a victim. And then we need to consider how she would be treated in the Dominican Republic as a result of that. So let me ask you, if she had an adverse credibility finding, but there were a medical record documenting her rape. That would be an entirely different situation. And we would have independent corroborating evidence that the immigration judge could look at to determine whether or not, even despite the adverse credibility finding, there's substantial documentary evidence to establish that she was a domestic violence victim. That's an entirely different case. Also, I think many of the CAT claims, when you have a situation where you have an adverse credibility finding, but there's still evidence that needs to be considered, you see that in a lot of cases where, say, perhaps you have an Indonesian Christian, and the immigration judge may disbelieve the specific facts of their claim about what happened to them individually. But then there's evidence in the record that show that all Indonesian Christians are subject to some forms of discrimination. That evidence needs to be considered, despite the adverse credibility finding, because you know that there could be other country condition evidence that's relevant to the claim. Here, we don't have that. We don't have any sort of independent grounds to consider CAT outside of the domestic violence claim. Kagan. I guess the question I have is, does the adverse credibility finding need to be more textured? I mean, it's clear she lied on multiple interviews and documents. And the immigration judge does allude to the fact that there's reasons for this. And we know that domestic violence victims are often reluctant to report it, particularly if you live in a country where bad things happen if you do report it. So the adverse credibility finding was based solely on, you know, her citizenship and those kind of issues. It they never really, the immigration judge didn't ever say anything about the disbelief with respect to the domestic violence. Is that true? That's true. But under the rule, I think. So I guess I'm wondering in that case whether there needs to be almost like a subcredibility finding in order to proceed with a CAT claim. In terms of a CAT claim? Just the CAT claim. Mm-hmm. In that case, still, I think the credibility finding as the domestic violence controls in this case. I'm not clear as to the difference between the CAT claim. Well, the credibility finding isn't, in other words, none of the reasons given really related to the domestic violence, did they? They didn't. But under the Real ID Act, it doesn't have to go to the heart of the claim. I know. Right. But I'm suggesting to you that because it doesn't have to go to the heart of the claim and they did find her not credible, but none of the adverse credibility findings actually related to the domestic violence. So I'm really wondering whether Camalthus really controls here because we don't really have an adverse credibility finding with respect to domestic violence. But we have an adverse credibility finding saying that we can't believe Petitioner's testimony. And I guess that would have to – the immigration judge would have to be required to say, I have to set aside these four interviews with immigration officials, I have to set aside that she lied under oath in Federal court in criminal proceedings and ignore that, and determining whether or not she's now telling the truth regarding this claim that she could have presented many times before and chose not to. So those prior lies are relevant to her claim. Even if there aren't internal inconsistencies, these are still relevant factors that the immigration judge was permitted to consider. And the record doesn't compel the conclusion that the immigration judge had to ignore those and that they weren't relevant for withholding or for cat. Could you tell me a little bit about her testimony in the United States district court? You – the board indicates that she was told by the judge that she was obligated to tell the truth. Was there anything more than the oath? She testified that she was being told. No, no, no. The judge telling her she had to tell the truth. Was there anything said to her other than the oath she had, that everybody takes as a witness in court? We don't have a transcript of proceedings. So we don't know exactly what occurred. What is this? Do we know what it means? If the judge told her she was obligated to tell the truth. That's what she testified to before the immigration judge. In the record, what we have is the complaint. We have the plea agreement and the conviction documents. That's it. We don't actually have a transcript. No transcript. Exactly. So we don't have a transcript of the oath, but she did testify and agree that she was informed by the district court judge that she was obligated to tell the truth and that she was represented by Spanish-speaking counsel in those district court proceedings. In addition to relying on these prior false statements, the immigration judge also considered her testimony before the immigration judge. He considered her explanation that she did not disclose her true identity and she did not disclose she claims to be a Mexican citizen because she was afraid of being returned to the Dominican Republic. But the immigration judge also found that she backtracked and equivocated regarding the interviews that she had with these immigration officers. And she claimed she didn't remember being told by these immigration officers that she had to tell the truth. She claimed that her statement was not read back to her before she signed it, even though the statements all indicate that she was, that she did, was read the statements back and that she signed them and that the immigration officer signed them and that she initialed each page. She denied that the officers had explained to her the purpose of the interview and just stating that the officers asked her the common things. She testified specifically that during the interviews no one ever explained what asylum was until she was told by a fellow detainee that she should request asylum. She reiterated that during this interview she was just asked her name, date of birth and where she was from. But then later she equivocated. The immigration judge went through the advisals with her specifically in her testimony and after the immigration judge reviewed the advisals with her, she stated that if they had been given to her, given to her, then she might have provided her correct name and information. And then when asked, well, is she claiming that they weren't given to her based on that statement? She then claimed she couldn't remember whether they were given to her. She claimed that even if she had been asked if she feared harm, she would have said no because she was going to be returning to Mexico. And the immigration judge properly considered all of this and considered and found it not believable that after four of these interviews in which she was formed of her rights that she still didn't remember any of these advisals, didn't remember receiving any of this information, and originally claimed that she, in fact, did not know that she had asylum available. So the immigration judge considered not only these prior false statements, but her lack of candor before the immigration judge in regards to what happens in these interviews in rejecting her explanation. Thank you. Unless there's other questions. No questions here. All right. We gave Attorney General a few extra minutes. If you would put two minutes back on the clock, which is that was the amount you had asked for in the beginning. Yes. Is that right? Thank you. She would change the clock. Yes. We're waiting for the clock to get changed. You can keep going. Can you get it to 2? Can you get it back to 2? Why don't you put it up? You were close. Leave it at 15, and then we'll you can take a look when it's at 13. That will mean two minutes. All right. Okay. Thank you. I'd like to correct three errors made by the government. First, though, she stated that Ms. Carrion said was equivocating in immigration court. In fact, the immigration judge mischaracterized her statements and the record, or her statements in court, to say that she was equivocating. First, the immigration judge, in his opinion, said that the Respondent herself states that if these statements would have been made to her, she would remember them. That's at AR-41. And, in fact, the IJ had paraphrased two sentences from four paragraphs that he admitted were very technical and very detailed, and then said in his decision or what she had actually said is that, well, if they had said it the way you're saying it right now, in a very clear way, I might have given my correct name and my correct information to take advantage of that. And that is what the IJ said was her responding that if the statements had been made to her, she would remember them. So Ms. Carrion consistently testified that she did not remember every statement that was made to her at these at the border interviews, and that was mischaracterized in the record. What about at the district court level? Right. In the district court, she said that she did not, she did not remember or she remembers being told to tell the truth, but she was still afraid of revealing her true identity and she did not. There was no, there's nothing in the record and the government didn't point to anything saying that she would know that if she told this judge, Ms. Carrion did not know. She went in before an Article III judge in a district court, ended up defending herself and didn't tell the truth after being sworn to tell the truth. Isn't that enough for the immigration judge to draw an adverse credibility from you? Right. While the immigration judge may look to anything in the record, and these, we do say that these are lies that she admitted to, Shrestha also holds that the, you have to look at the totality of circumstances and the context in which they were made. This Court in Kibede, Paramasami, and Musa has held that women who experience sexual violence victims do not need to disclose these rapes at the first opportunity. Indeed, the women in those cases had several opportunities talking to different members of the U.S. Government about their, specifically about their abuses as opposed to about sexual proceedings, and even though those women did not disclose in initial encounters that they had been raped and that was part of their claim and that they didn't share everything about their stories. She didn't share anything on five occasions. Right, Your Honor. So, I mean, she's quite distinguished from a number of these other cases where there's a delay in reporting, for example. Right, Your Honor. But in those cases, this Court has held that if the Respondent gives a, or if the noncitizen gives a strong explanation of why they did not disclose, then they should not be punished for whatever, you know, their fear of disclosing that earlier. So in each of the cases, in Cabrera, Parra, Monsanto and Musa, though the women had not shared their stories, they later explained why, and so they were not, the timing of their disclosure was not seen as the bellwether of the truth. Thank you. The case just argued. Carreon Garcia versus Holder is submitted. I note again that Ms. Hong is here from the Boston College pro bono program, and we appreciate the argument by the law students, Ms. Ozolins and Ms. Houck. Welcome back again, Ms. Walters, and thank you for the government's participation as well, and coming from Washington, D.C. Again, we thank everyone for participating in the pro bono program. It's very helpful to the Court to have well-drafted briefs and have the legal issues laid out so nicely.
judges: Wallace, McKeown, Gould